**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SEAN MASON, ) | |
| ) | Civil Action No. 1:07-cv-05615 |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Suzanne B. Conlon |
| ) | |
| MEDLINE INDUSTRIES, INC., and ) | Magistrate Judge Jeffrey Cole |
| THE MEDLINE FOUNDATION, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT**

**Overview**

Medline Industries, Inc. ("Medline") sells supplies to hospitals and other health-care providers. Relator Sean Mason, who once worked for Medline, claims Medline violated the False Claims Act in a variety of ways. The complaint is at once striking for its prolixity and for its lack of particularity as to the fundamental details of the claimed fraud. But the rhetoric, length and complexity of a false claims complaint are no substitute for the particularity required by Rule 9(b). *See United States ex rel. Fowler v. Caremark Rx, L.L.C.*, No. 03 C 8714, 2006 WL 3469537, at *9 (N.D. Ill. 2006) (Conlon, J.) (Att. 3),[1] *aff'd*, 496 F.3d 730, 741 (7th Cir. 2007).

Mason broadly asserts three schemes, each with multiple mechanisms. One scheme is that Medline allegedly defrauded the Veterans Administration ("VA") by submitting claims that were inflated because either the VA agreed to the wrong benchmark customer for setting pricing or because Medline manipulated pricing to that customer. The second is that Medline overbilled the VA's mail order pharmacy program for products Medline obtained from other manufacturers by charging more than Medline's actual cost. The third is a supposed scheme to bribe customers

---

[1] All references to "Att." are to attachments to the Defendants' Motion to Dismiss, filed with this Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint.

to purchase supplies from Medline, causing the customers to submit claims to Medicare that were false because they failed to account for rebates and similar benefits paid by Medline (although no such failures are specifically identified) and because they falsely certified compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (even though Mason disavows any allegation as to the providers' intent, thus rendering himself unable to establish that the providers in fact violated the Anti-Kickback Statute). Indeed, under Mason's absurd theory, a single transaction with a customer that was determined to be an anti-kickback violation would lead to all government reimbursement to that supplier being recoverable under the theory that the supplier falsely certified its compliance with health care statutes, even if the supplier did not knowingly engage in wrongdoing.

Count I is brought under the False Claims Act, 31 U.S.C. § 7329(a)(1). To establish a claim under that act, "a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States ex rel. Fowler v. Caremark Rx, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007). Mason fails to satisfy any of those elements; and to the extent the false claims allegations are predicated on alleged underlying violations of the Anti-Kickback Statute, he fails to satisfy the elements of that statute as well. Mason's claims suffer from several fundamental flaws which require dismissal under Fed. R. Civ. P. 12(b)(6) and 9(b):

First, as to the direct sales to the VA, Mason alleges no specific false representations or false claims. (See Part I below.)

Second, with respect to the VA's mail-order pharmacy program, Mason depends on a contractual provision that simply does not exist, a fact that Mason has attempted to evade by not

2

attaching or quoting the relevant contract provision, and again he fails to identify any false claims.  (See Part II below.)

Third, with respect to alleged "kickbacks and bribes" to customers, Mason (a) identifies no false claims, (b) fails to allege that any false claims were caused by Medline, (c) fails to allege a material impact on government reimbursement, (d) fails to establish a plausible claim for relief under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), because he offers no reason to believe that the things it characterizes as "bribes and kickbacks" (like customer rebates and contributions to charities like the Red Cross) are actually violations of the Anti-Kickback Statute, and fails to plead the underlying alleged bribes with particularity; and (e) fails to allege scienter under either the False Claims Act or the Anti-Kickback Statute.  (See Part III below.)

Count II, brought under the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 Ill. Comp. Stat. § 715/1 *et seq.*, is deficient for the same reasons as Count I and also because the complaint contains no specific allegations as to presentation of claims to the State of Illinois.  (See Part IV below.)

In short, this complaint represents precisely the sort of rhetorical indictment that Rule 9(b) and *Bell Atlantic* are designed to prevent.  It should be dismissed with prejudice.

**Argument**

**I.   Mason has not alleged any specific misrepresentations or false claims based on the use of Amerinet as the tracking customer.**

Mason alleges that Medline overcharged the VA for direct sales under the Federal Supply Schedule ("FSS").   The VA and Medline have agreed that Medline will not charge more for items on the FSS schedule than Medline charges to members of Amerinet, a group purchasing organization ("GPO") that negotiates pricing for its members.  (¶¶ 134, 143, 145.)

Mason alleges two ways in which Medline supposedly defrauded the VA in connection with its FSS sales. First, he suggests that Medline failed to give the VA accurate information on Medline's pricing to customers other than Amerinet. (¶ 144.) He apparently seeks to suggest that Medline somehow tricked the VA into adopting Amerinet as the tracking customer.

It is fundamental under Rule 9(b) that when a plaintiff charges a fraud, he must allege the circumstances of the fraud--including the who, what, when, where and how--with particularity. *See Fowler*, 496 F.3d at 740. This particularity requirement is crucial to prevent the complaint from being used to extort a settlement or as a "fishing expedition." *See, e.g., Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) (one of the main purposes of Rule 9(b) is to guard against "fishing expeditions" by the plaintiff); *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 144 (N.D. Ill. 1993) (purpose of Rule 9(b) is "to inhibit claims that are filed as a pretext to uncover unknown wrongs"). *See also U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004) (plaintiffs must plead FCA claims with particularity to prevent assertion of "baseless allegations used to extract settlements").

Here, Mason simply alleges in the most conclusory way that Medline did not provide the government with complete or accurate pricing information for other Medline customers. (¶ 144.) However, Mason does not identify with any particularity what information Medline did or did not present on any customers, when or if the VA asked for such information, how any such pricing information it provided was incomplete or inaccurate, or whether any such information was material. Mason also asserts that Amerinet was an improper tracking customer because Medline "misrepresent[ed] that Amerinet received Medline's lowest pricing for customers buying similar volumes." (¶ 148.) But this conclusory allegation is no better; Mason fails to identify the person who made the misrepresentation, the person to whom it was made, its date or

4

place, or its specific contents.  Critically, Mason fails to allege that other GPO's were more like the VA in their purchasing volumes than Amerinet was -- if they were not, then the agreement to use Amerinet as the tracking customer was perfectly appropriate.

Second, Mason claims that even if Amerinet was the right benchmark customer, Medline tried to circumvent the Amerinet benchmark through various means that allowed Medline to provide favorable pricing to Amerinet members without passing the same savings on to the VA. (¶ 154.)  For instance, the complaint asserts that Medline encouraged "certain" Amerinet members to leave Amerinet and join a different GPO so they could receive below-government pricing.  But the complaint never identifies a single customer who was encouraged to leave Amerinet or when or where it happened, much less identify one who actually left, who actually received lower pricing, and whose new pricing and volume was such that it would have a material effect on the pricing to the VA.  Mason has alleged a generality without any of the particulars necessary to meet the requirements of Rule 9(b).

The same is true for the other supposed schemes to circumvent the benchmark.  Mason alleges that Medline encouraged some Amerinet members to send Medline letters switching to direct sales so Medline could charge them less.  (¶¶ 163-164.)  He does not allege any particulars, such as the date of the letters, the identity of the author or sender of the letters, whether any specific customer switched to direct sales, and whether that customer's remaining in Amerinet would have had any effect on the price charged to the VA.  The other types of conduct offered by Mason suffer the same fundamental flaw:  he pleads a general scheme but without the details.  *See* ¶¶ 156-158 (no examples of deleting Amerinet price tag, who did it, who the customer was, or what the product was); ¶¶ 161-162 (no particulars relating to identity of customer, Medline person involved in the supposed deception, dates, or amounts); ¶¶ 165-66 (no

identification of date or customer); ¶¶ 167-169 (no specification of misrepresentation or false claim); ¶¶ 159-160 (only example is one Mason "believes" received discounts; no product specified and no allegation that Medline agreed with VA not to give Amerinet members discounts on products that were not on the government contract).

There is another fundamental problem with Mason's allegations as to a tracking customer -- nowhere does he identify any specific false claims resulting from the alleged schemes. The "*sine qua non* of a False Claims Act violation" is evidence of an actual false claim submitted to the government. *Karvelas*, 360 F.3d at 225; *see also United States ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.,* No. 03 C 2750, 2008 WL 5211021, at *5 (N.D. Ill. Dec. 10, 2008) (Kennelly, J.) (Att. 4); *United States ex rel. Duxbury v. Ortho Biotech Prod., L.P.*, 551 F. Supp. 2d 100, 114 (D. Mass. 2008). The most Mason provides is a list of delivery orders, without specifying how any particular delivery order could constitute a false claim. This does not suffice. *See Fowler*, 496 F.3d at 734 (relator failed to "tie a specific fraudulent transaction to an invoice submitted to the government") (*quoting United States ex rel. Fowler v. Caremark Rx, Inc.*, No. 03 C 8714, 2006 WL 2425331, at *6 (N.D. Ill. 2006) (Conlon, J.)). The failure to identify any false claims arising from the allegedly improper use of a tracking customer is fatal to Mason's allegations.

In short, all the allegations concerning Amerinet, taken in the light most favorable to the plaintiff, fail to plead any fraud or false claims with the particularity required by Rule 9(b).

## II.   The VA mail-order contract did not require Medline to charge its actual cost plus a fixed fee.

Mason claims that Medline defrauded the VA in connection with Medline's sales to the VA of prescription items that Medline purchased from other manufacturers and distributed to

VA patients under a Consolidated Mail-Order Pharmacy ("CMOP") contract.   The heart of this claim is that with respect to such goods, Medline was contractually obligated to charge a fixed distribution fee plus the lower of (a) Medline's actual acquisition cost for the item or (b) the government's pricing under any supply contract the government might have with that manufacturer.

The most fundamental problem here is that the contract contains no requirement making Medline's acquisition cost a relevant factor.  To the contrary, the contract explicitly contemplates that Medline's charge will instead be based on the pricing the government itself has established with these other providers.  For example, the 2001 CMOP contract, which was extended several times up through March 1, 2007, says that "VA has established (separately from this solicitation) contracts...for products and prices that will be distributed through this solicitation/contract." *See* Att. 1, Ex. A at § 6.[2]  Thus the prices Medline is obligated to charge to the VA are those separately set by the government with the manufacturers; nowhere does the contract say that Medline's price for such goods must be based on Medline's acquisition cost if that is lower than the price negotiated by the government with the manufacturer.  Since no such requirement exists, Medline cannot have made any false claims based on the failure to charge such a price.  Indeed, the contract also recognizes that the VA may make "open market" purchases, i.e., purchases "not priced by a Federal Government contract." Att. 1, Ex. A at § 20. Even as to these open market purchases, the contract does not require Medline to charge the VA its actual acquisition cost.

Even if Mason were right about the pricing standard, he has utterly failed to allege a fraud with particularity.  To begin with, he fails to identify any false claim, relying solely on a

---

[2] Because the CMOP contract is specifically referenced in the Amended Complaint and is central to Mason's claim, this Court may consider its contents in the context of this motion to dismiss. *See, e.g., Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

cryptic list of delivery orders (¶ 184) without specifying how any of those orders constitute false claims. Moreover, neither of the purported manners in which Medline accomplished the fraud is supported by any details. First, he asserts that Medline acquired "gray market" goods (apparently at a lower price) and then resold them to the VA (¶¶ 171-78), but he does not allege there is anything unlawful or fraudulent about buying "gray market" goods, or that the VA forbids Medline to sell such goods to the VA, and he identifies not a single product, date, or amount. Second, he asserts that Medline increased VA CMOP prices based on fictitious cost increases. Even assuming Medline's costs were relevant (which they were not), Mason fails to allege any particular product, misrepresentation as to cost, false claim, perpetrator or date. Again, these allegations fail the test of Rule 9(b).

## III.    The "kickbacks and bribes" allegations fail to satisfy the elements of the False Claims Act or the Anti-Kickback Statute.

Mason's assertions as to a third scheme -- the use of rebates, "disguised rebates" and other customer benefits as "kickbacks and bribes" that cause customers to file false claims with the government -- are equally flawed, for the host of reasons described below.

### A.    The Amended Complaint does not identify any false claim submitted to the government.

As noted above, the essence of a False Claims Act violation is the submission of a false claim to the government. Even were Mason correct in any of his theories about conduct he regards as kickbacks or bribes, his complaint cannot survive a motion to dismiss because he has not pled a single false claim with particularity. The failure to plead at least some specific false claims is fatal. *See Karvelas,* 360 F.3d at 225; *Kennedy,* 2008 WL 5211021, at *5 (Att. 4).

Mason identifies two types of documents that he says could constitute claims: claims submitted electronically or by hardcopy on Form CMS-1450, also known as UB-92 (¶ 106), and

the providers' annual Medicare cost reports (Form CMS-2252) (¶ 107).  As to the former, the complaint simply does not allege that false Form CMS-1450/UB-92's were submitted by providers, much less identify any specific false forms.

As to the cost reports, Mason identifies no reports in connection with the vast majority of providers who were supposedly bribed.  More importantly, as to the handful he does identify (¶ 121), Mason fails to allege that these are <u>claims</u> for reimbursement which would trigger the application of the False Claims Act.  To the contrary, Mason alleges that providers receive Medicare and Medicaid reimbursement under flat rate fee schedules based on categorizing of patients by Diagnosis-Related Groups ("DRGs").  (¶ 105.)  Mason describes a cost report, in contrast, as a type of financial statement, which includes aggregate "information regarding med-surg supplies and all other costs incurred in connection with treating covered patients."  (¶ 107.) He lists certain cost totals reflected in the cost reports for a handful of customers (¶ 121), but he does not explain how submission of aggregate cost information could constitute a "claim" where, as here, reimbursement is based on flat rates. *See United States ex rel. Lacy v. New Horizons, Inc.,* No. CIV-07-0137-HE, 2008 WL 4415648, at *2-3 (W.D. Okla. Sept. 25, 2008) (Att. 5) (allegations regarding annual reports were insufficient in part because there was "no indication of the specific amount that ultimately was overcharged to the government," and no "basis for associating the annual report with a particular request for payment").  Even more telling, Mason refers in several places in the complaint to "cost reports *and* claims" (¶¶ 8, 18, 19, 33, 34, emphasis added), thus recognizing that a cost report is not itself a claim.

Even assuming the cost reports constituted claims, Mason does not adequately allege they were false.  He provides two theories as to falsity.  The first is that the cost reports failed to reflect payments or benefits received from Medline.  (¶ 122.)  Although Mason alleges the total

9

amounts reflected on those cost reports, he makes no particular allegations as to how those cost reports relate to charges from Medline. *Cf. Kennedy*, 2008 WL 5211021, at *5 (Att. 4) ("relators have failed to identify any particular cost report submitted to CMS that contains a claim for an off-label use of Lovenox as a covered expense"). Indeed, Mason concedes that "depending on how a Provider accounts for their costs," discounts or rebates from Medline could be included in various different places on the cost reports, including being "incorporated into the total number" for various costs or as part of an "aggregate amount" under adjustments to expenses. (¶ 116.) As to several of the cost reports, Mason expressly concedes that certain amounts in those reports "may or may not include payments from Medline." (¶ 121.) The mere fact that customers filed cost reports with various aggregate numbers that "may or may not" include payments from Medline does not suffice to plead the submission of false claims. *See Karvelas*, 360 F.3d at 234-35 ("While Karvelas does describe the procedures allegedly used by the hospital to submit false claims to the United States, the alleged existence of such procedures does not permit us to speculate that false claims were in fact submitted"); *Duxbury*, 551 F.Supp.2d at 116 ("the court is not permitted to surmise that false claims 'must have' occurred as a result of defendant's conduct. No matter how likely the existence of false claims, this court cannot speculate that such claims inevitably flowed from Defendants' activities") (citations omitted).

Thus as in *Fowler*, Mason pleads only half of the allegedly fraudulent transaction; he does not plead with any particularity how Medline's customers accounted for or reported the alleged bribes. As it is the customers who allegedly submitted false claims, this lack of particularity as to the accounting behind those claims is fatal. *Cf. Fowler*, 496 F.3d at 741-42 (where relators pled facts only as to returned prescriptions and not as to whether defendant

replaced the returned prescription with another one without charge, relators had "only one-half of the evidence they need to survive under Rule 9(b)").

Mason's second theory is that the providers' cost reports were false because they falsely certified that the providers were in compliance with health care laws when they had in fact accepted bribes in violation of the Anti-Kickback Statute. (¶¶ 110, 122.) This theory depends on the providers themselves having violated the Anti-Kickback Statute and falsely certified to the contrary. Significantly, however, Mason's own allegations are inconsistent with the conclusion that the providers violated the Anti-Kickback Statute. One of the elements of a violation of the Anti-Kickback Statute is that the perpetrator engage in wrongful conduct *with knowledge that the conduct was wrongful. U.S. ex rel Sharp v. Consol. Med. Transp., Inc.,* No. 96 C 6502, 2001 WL 1035720, at *5 (N.D Ill. 2001) (Andersen, J.) (Att. 6). *See also Hanlester Network v. Shalala,* 51 F.3d 1390, 1400 (9th Cir. 1995); *United States v. Jain,* 93 F.3d 436, 440-41 (8th Cir. 1996). Mason specifically disavows any allegation that providers possessed fraudulent intent. (¶ 34.) Thus even assuming that Medline violated the Anti-Kickback Statute, the providers did not -- since the providers did not knowingly do anything wrong, they cannot have violated the Anti-Kickback Statute, and they cannot have submitted a false certification.

Moreover, in order for providers to have violated the Anti-Kickback Statute, they must have received remuneration "in return for" purchasing goods to be reimbursed by the government. 42 U.S.C. § 1320a-7b(b). Mason has not alleged with any specificity that the bribes the providers allegedly received were in return for purchasing goods from Medline. Accordingly, he has not sufficiently pled that the certifications were false. The failure to allege any actual false claims with particularity requires dismissal of the complaint.

**B.     The Amended Complaint fails to allege that submission of any false claims was caused by Medline.**

Even assuming that providers submitted false claims, Mason has failed to plead facts sufficient to show that the submission of false claims was "caused" by Medline. *See* 31 U.S.C. § 3729(a)(1). Mason has not alleged that Medline even knew how the providers completed their cost reports or provided any input into what was filed on a cost report. In fact, as Mason well knows, many of Medline's contracts with providers expressly obligate the providers to report rebates and other benefits appropriately. For example, the contract between Medline and Sinai Health System, for which Medline allegedly paid a rebate to its affiliated foundation instead of to the entity itself (¶ 74), expressly obligates Sinai Health System to properly notice and report all discounts and rebates, including submitting cost reports that comply with applicable regulations.[3] *See* Att. 2, Ex. A at § 3.11.[4] Even if, for argument's sake, Medline was aware of the possibility that providers might file claims that overstated what they actually paid, such awareness would be insufficient to state a claim. *Cf. United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 933 (8th Cir. 2001) (even if defendant knew relator would submit false claims, that does not mean defendant "caused" relator to do so).

**C.     The Amended Complaint fails to allege that false claims caused a material impact on government reimbursement.**

To sustain his claim, Mason must also allege with particularity a link between the government's decision to pay and an allegedly false certification. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005); *Luckey v. Baxter*

---

[3] *Cf. United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 148-49 (D. Mass. 2000) (dismissing FCA complaint with prejudice under Rule 9(b) because disclosures of discounts in invoices by supplier to hospitals "negate any inference of improper scienter").

[4] Because the contract with Sinai Health System is referenced in the complaint and is central to the relator's claim, the contract may be considered in connection with this motion. *See* above at n.2

*Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999); *Kennedy*, 2008 WL 5211021, at *5

(Att. 4).  In other words, "plaintiffs must plead (and ultimately prove) that had the government

known about the kickback scheme, it would have refused payment of the claims . . . ."  *Sharp*,

2001 WL 1035720, at *10 (Att. 6).[5]

In this case, even if the providers' cost reports were considered claims, the allegations are

patently insufficient to show a material impact on government reimbursement.  Mason does not

allege that the health-care providers were reimbursed based on what Medline charged them for a

particular product; rather, he concedes they are reimbursed based on flat rate fee schedules.  (¶

105.)  Simply put, even if Medline overcharged a provider for a particular item, there is little or

no connection between that charge for that item and what the government pays the provider,

which is an average based on costs of hundreds of hospitals and other providers for all their

patients with a particular illness, not based on a particular cost for a particular product charged

by a particular hospital.  Judge Kennelly cogently explained the fallacy underlying Mason's

complaint in dismissing the False Claims Act complaint in *Kennedy*, 2008 WL 5211021, at *5

(Att. 4):

> As an initial matter, a DRG is, by definition, a prospective rate.  That is, the DRG
> rate is an estimate of the average cost of treating the illness during the following
> year.  Thus, a cost report may only affect future DRGs.  Second, a single
> hospital's cost report, or even several hospitals' reports, amount to a small portion
> of the data that inform the decision to increase or decrease DRGs.  The FCA
> imposes liability only when a false statement or record is used "to get a false or
> fraudulent claim paid by the Government."  31 U.S.C. § 3729(a)(2). . . .  Because

---

[5] *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), is not to the contrary.  *Rogan* involved a
criminal conviction of a hospital administrator for systematically paying for referrals of patients
and submitting bills for medically unnecessary services. Because the defendant was obviously
ineligible for government reimbursement, the court found that the government need not show
that the government would not have reimbursed the defendant had it known that the services
were unnecessary. Here, in contrast, the alleged misconduct was not by the entity submitting the
reimbursement claims to the government, and it involved alleged false cost reports rather than
padded bills.  In these circumstances, the cases cited in the text should be controlling.

relators have not tied the cost reports to particular claims, they have failed to allege that an individual hospital's cost reports are material to the payment of any given claim." *Id.* at *5. [6]

As in *Kennedy*, the complaint here utterly fails to tie false statements about costs on the financial reports to any overpayment by the government. Even further afield is the suggestion that the false statement causing harm to the government is the provider's certification that it had complied with the Anti-Kickback Statute. (¶ 110.) Assuming, contrary to fact, that the providers had received kickbacks, there is absolutely nothing in the complaint to indicate that the government in fact would have withheld Medicare and Medicaid reimbursements to providers who in fact treated patients with the appropriate DRG code if the alleged kickbacks were disclosed. *Cf. United States ex rel Roop v. Hypoguard USA, Inc.*, No. 07-3781, 2009 WL 674142, at *5 (8th Cir. Mar. 17, 2009) (Att. 7) ("The conclusory allegation that unidentified government agents 'would not have reimbursed through Medicare individuals submitting claims [for Hypoguard systems] if [they] had known of the defects and failure to comply with the rules and regulations of the FDA' does not comply with Rule 9(b)" (citations omitted)).

Because there is little or no connection between the alleged false cost reports and the government's reimbursement, Mason has failed to plead materiality and causation.

### D.    The underlying "kickbacks and bribes" are not pled with particularity and do not establish a plausible claim for relief.

#### 1.    Mason fails to satisfy the *Bell Atlantic* standard for pleading wrongful conduct.

The complaint fails to specify facts from which one should conclude that the described conduct is wrongful. Under *Bell Atlantic*, a complaint in a potentially complex litigation "must

---

[6] Similarly, courts have recognized that a violation of the Anti-Kickback Statute does not result in a loss to the government where the government would have paid for the services even in the absence of the kickback. *See, e.g., United States v. Anderson*, 85 F.Supp.2d 1084, 1102 (D. Kan. 1999) (limiting restitution to amount of bribes or consulting fees actually reimbursed by Medicare, and rejecting restitution based on total Medicare reimbursement).

have some degree of plausibility to survive dismissal." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). This means the "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555; *see also Kushner v. Illinois State Toll Highway Auth.*, 575 F. Supp. 2d 919, 922 (N.D. Ill. 2008) (Conlon, J.). Here, the allegations are too feeble to get beyond speculation of wrongdoing.

Many of the "bribe" allegations involve various forms of rebates, including prebates (rebates paid in advance, conditioned upon sufficient future sales to earn the rebate), Medline purchases of inventory from customers in connection with consignment programs, and "rebate credits." Mason concedes that "[t]raditional rebates in the medical industry are a common and legitimate practice." (¶ 51.) He nonetheless argues that the conduct attributed to Medline amounts to fraud because the types of rebate at issue: (a) make the payments "difficult to trace to ensure proper disclosure;" and (b) increase the potential for overutilization. (¶¶ 55-64.) In support, he cites an OIG letter saying that prebates and related payments pose a "risk" of fraud and overutilization. (¶ 55.) But the OIG letter does not outlaw these types of rebates, and Mason fails to allege that Medline neglected to obligate its customers to properly report them.[7] Nor does he allege specific facts suggesting that the conduct he attributes to Medline resulted in overutilization or otherwise increased the amounts paid to providers by the government.

Mason also alleges that Medline "bribed" customers by hiring family members or by taking them to sporting events. As with rebates and similar payments, the meager facts alleged in the complaint are equally consistent with innocent and commonplace corporate practices. (¶¶ 80-84.) For example, Medline hired the son of an employee of a GPO. (¶ 80.) Mason asserts that this is tantamount to bribery but offers no reason to choose his unsupported suspicions over

---

[7]*See above* at p. 12.

the far more plausible explanation that -- like most companies -- Medline hires people who are introduced by people it knows (including customers) and whose judgment it trusts.

In the end, Mason is reduced to claiming, without any supporting evidence, that Medline's charitable foundation is really a sham for bribing customers.  This allegation is not only inherently implausible but undercut by the complaint itself, which acknowledges that the Foundation funds scholarships for students and contributes to charitable organizations like the United Way and the American Red Cross.  While some recipients are health-care providers -- including "potential customers" (i.e., non-customers) (¶ 89) -- many of the recipients are not providers at all but rather charitable foundations, including the Henry Mayo Newhall Memorial Foundation, the St. Francis Hospital Foundation, the Research & Ed Foundation of Michael Reese Staff, and the Kettering Medical Center Foundation.  (¶ 100.)  There is nothing, besides Mason's imagination, to suggest that the Medline Foundation's charitable donations are really bribes.

Such speculation, rampant throughout the complaint, does not satisfy the pleading requirements set forth in *Bell Atlantic*.  Indeed, allegations that the hiring of a consultant was "perhaps" a favor to a customer (¶ 79) or that an employee received severance pay "apparently" to mollify a customer (¶ 82) are very similar to allegations that have previously been held insufficient.  *See Beck v. Dobrowski*, No. 07-3967, 2009 WL 723172, at *4 (7th Cir. Mar. 20, 2009) (Att. 8) (complaint that contended shareholders "perhaps" would have liked more information did not satisfy *Bell Atlantic* standard).

### 2. Mason does not describe kickbacks and bribes with sufficient particularity.

Not only do the allegations of the underlying bribes fail to rise above speculation of wrongdoing, they also fail to include some of the most basic details of the "who, what, when,

and where" required by Rule 9(b). With respect to traditional rebates (¶ 46), for example, four recipients are identified but no other details are pled. (¶ 52.) The same failures pervade his allegations as to other forms of rebates. See, e.g., ¶¶ 56-58 (no allegation as to whether hospital ultimately met the requirements for prebate or refunded the prebate); ¶ 59 (no allegation as to who was involved, the terms of the agreement, the amount of the prebate, or any other details relating to the payments at issue); ¶¶ 60-67 (no allegation of the dates of payments, the terms of the arrangement with the customers, and for most of the examples even the amounts of the payments); ¶¶ 69-76 (no details are pled as to the date, the amounts, whether lease payments were at fair market value, whether credits were meant to induce business, or how they were accounted for). The allegations of "bribing provider officials" by hiring relatives or entertaining them at sporting events are similarly non-specific. (¶¶ 77-87.)

As to many of these supposed bribes, Mason also infers a company-wide policy or practice from a few examples. Isolated examples, however, are insufficient to state a claim as to a company-wide practice. *Fowler*, 2006 WL 3469537, at *8 (Att. 3) (two examples "cannot support allegations of company-wide fraud"); *United States ex rel. Thomas v. Bailey*, No. 4:06CV00465 JLH, 2008 WL 4853630, at *6 (E.D. Ark. Nov. 6, 2008) (Att. 9) (allegations of five anecdotal instances did not allege with sufficient particularity a nationwide corporate policy to cause false claims to be submitted by entering into agreements that violated the Anti-Kickback Statute).

In sum, Mason has simply not alleged kickbacks and bribes with the particularity required by Rule 9(b).

**E.     Mason fails to allege scienter under the Anti-Kickback Statute or the False Claims Act.**

      **1.     Mason fails to allege that Medline knowingly caused submission of false claims.**

To state a claim under the False Claims Act, Mason must allege that Medline "knowingly" caused the submission of a false claim, a standard which includes reckless disregard or deliberate ignorance. *See* 31 U.S.C. § 3729(b); *Fowler*, 496 F.3d at 741. Although the particularity standard of Rule 9(b) does not apply with respect to scienter, allegations of intent must still not be pled as conclusions; rather, they must include enough of a factual basis from which one may conclude that the defendant acted with the requisite intent. *See Tricontinental Indus., Ltd. v. PricewaterhouseCooopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (issue is whether facts and reasonable inferences therefrom permit conclusion that false statements were made with requisite intent); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) (complaint must afford basis for believing plaintiffs could prove scienter).

In this case, the complaint fails to allege any facts suggesting that Medline knew that what Mason characterizes as kickbacks would result in the submission of false claims or that Medline acted in reckless disregard or with deliberate ignorance. The complaint merely asserts that "because Medicare and Medicaid pay a substantial percentage of all the medical bills in the United States, Medline knew and intended that Providers would submit cost reports and claims to the federal government that would include costs incurred for med-surg supplies purchased from Medline through kickbacks." (¶ 34.) Mason does not allege any facts suggesting that the cost reports accounted for benefits improperly, and he does not allege facts suggesting that

Medline knew the cost reports would be completed improperly.[8]  Essentially, the allegation is that because Medline engages in alleged kickback activities, and because Medline's customers receive Medicare and Medicaid reimbursement, Medline must have intended that its customers submit false claims.  This kind of generalized intent allegation is insufficient.

### 2.   Mason fails to allege that Medline knowingly made improper kickbacks and bribes

As Mason's "kickbacks and bribes" claims are predicated on alleged violations of the Anti-Kickback Statute, those claims cannot survive unless the elements of the Anti-Kickback Statute are satisfied.  One of the elements of a violation of the Anti-Kickback Statute is that Medline engaged in wrongful conduct *with knowledge that the conduct was wrongful. See* above at p. 11.  However, Mason has not alleged facts that would support a conclusion that Medline believed it was acting wrongfully -- not as to rebates, or prebates, or consignment programs, or any of the other items on his laundry list of improprieties.  This failure in itself warrants dismissal of the "kickbacks and bribes" allegations.

## IV.   Count II, under the Illinois Whistleblower Reward and Protection Act, should be dismissed for the same reasons as Count I and for failure to allege submission of false claims to Illinois.

Count II alleges that as a result of the misconduct alleged in the complaint, the defendants caused false or fraudulent claims to be presented to the State of Illinois for payment.  The IWRPA is interpreted consistent with federal law under the False Claims Act.  *See, e.g., State ex rel. Beeler Schad and Diamond, P.C. v. Ritz Camera Centers, Inc.*, 377 Ill.App.3d 990, 878 N.E.2d 1152 (1st Dist. 2007) (relying on federal case law interpreting the FCA to analyze the IWRPA).  Accordingly, Count II is deficient for the same reasons Count I is deficient.

---

[8] Indeed, the alleged facts are not inconsistent with the possibility that Medline's customers were contractually obligated to properly report payments and credits received from Medline.  *See above* at p. 12.

The IWRPA claim under Count II is also deficient for the additional reason that the complaint contains no specific allegations as to presentation of claims to the State of Illinois. Indeed, the only references to Illinois in the amended complaint relate to the residences of the parties, the location of certain providers and certain activities, and a conclusory allegation in ¶ 19 that Illinois "has paid millions of dollars to Providers based on thousands of cost reports and claims submitted to Medicaid that were tainted and rendered false by Medline's unlawful kickbacks to those Providers and/or bribes to their officials." Allegations about "millions" of dollars and "thousands" of cost reports and claims may sound impressive, but Mason is required to plead details, and he has not done so.

## Conclusion

For the reasons described above, the amended complaint should be dismissed in its entirety. Because the amended complaint reflects Mason's attempt to add detail to his original complaint, Medline submits that a dismissal with prejudice is warranted.


Dated: April 10, 2009                     Respectfully Submitted,


                                          By:   s/Robert R. Stauffer
                                                One of Their Attorneys

Anton R. Valukas
Charles B. Sklarsky
Robert R. Stauffer
Gregory M. Boyle
Ana R. Bugan
JENNER & BLOCK LLP
330 North Wabash Ave.
Chicago, IL  60611
Telephone: 312 222-9350
Facsimile: 312 527-0484

## CERTIFICATE OF SERVICE

I, Ana R. Bugan, an attorney, hereby certify that on April 10, 2009, Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint, was filed electronically with the United States District Court for the Northern District of Illinois, Eastern Division. Notice of this filing will be sent electronically to the following parties by operation of the Court's electronic filing system. Parties and interested persons may access this filing through the Court's system.

Charles F. Godbey
Margaret Riley Thomas
Attorney General's Office
State of Illinois
100 W. Randolph Street
Chicago, IL 60601

C. Barry Montgomery
Edward Roy Moor
Jordan Douglas Shea
Williams Montgomery & John Ltd.
20 North Wacker Drive Suite 2100
Chicago, Illinois 60606-3094

Robert A. Clifford
Timothy S. Tomasik
Kimberly Maureen Halvorsen
Courtney A. Marincsin
Brian S. Shallcross
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602

Rolando G. Marquez
Kirk E. Chapman
Milberg LLP
One Pennsylvania Plaza
49th Floor
New York, New York 10119

Michele Fox
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Patricia L. Hanower, Trial Attorney
Commercial Litigation Branch
United States Attorney's Office
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Dated: April 10, 2009

By:      s/Ana R. Bugan